747 S.E.2d 169

**In the Matter of Gary D. JAMES, Sr., Respondent.**

**Appellate Case No.2013–001165.**

**No. 27291.**

Supreme Court of South Carolina.

Submitted June 18, 2013.

Decided July 31, 2013.

---

18

Lesley M. Coggiola, Disciplinary Counsel, and Barbara M. Seymour, Deputy Disciplinary Counsel, of Columbia, for Office of Disciplinary Counsel.

Gary D. James, Sr., pro se, of North Myrtle Beach, for respondent.

PER CURIAM.

In this attorney disciplinary matter, the Office of Disciplinary Counsel (ODC) and respondent have entered into an

Agreement for Discipline by Consent (Agreement) pursuant to Rule 21 of the Rules for Lawyer Disciplinary Enforcement (RLDE) contained in Rule 413 of the South Carolina Appellate Court Rules (SCACR). In the Agreement, respondent admits misconduct and consents to disbarment. He requests the disbarment be made retroactive to November 15, 2011, the date of his interim suspension. *In the Matter of James,* 395 S.C. 333, 718 S.E.2d 430 (2011). In addition, respondent agrees to pay the costs incurred in the investigation and prosecution of this matter by ODC and the Commission on Lawyer Conduct (the Commission) within thirty (30) days of the imposition of discipline. Further, within sixty (60) days of the imposition of discipline, respondent agrees to enter into a payment plan to pay restitution as enumerated hereafter. We accept the Agreement and disbar respondent from the practice of law in this state, not retroactive to the date of respondent's interim suspension. In addition, respondent shall pay the costs incurred by ODC and the Commission in the investigation and prosecution of this matter within thirty (30) days of the date of this opinion and shall, within sixty (60) days of the date of this opinion, enter into a payment plan with the Commission to pay restitution as set forth hereafter in this opinion. The facts, as set forth in the Agreement, are as follows.

### *Facts*

#### *Matter I*

From 2003 until his interim suspension in November 2011, respondent was a solo practitioner. His practice focused primarily on real estate matters, but he also handled probate matters.

Respondent maintained two trust accounts at Conway National Bank. One account was for real estate transactions; the other was for all other client matters. Respondent did not fully comply with the recordkeeping and reconciliation requirements set forth in Rule 417, SCACR, for either account. Respondent's monthly reconciliation process consisted of comparing his monthly bank statement to his client settlement statements, then checking off items on the settlement statements as those items cleared. Once all items on a settlement

statement cleared, respondent shredded the settlement statement. Respondent did not maintain client ledgers for six years as required by Rule 417. Other violations of Rule 417 included failure to create or maintain reconciliation reports. As a result of respondent's lack of records, a complete accounting of funds is not possible.

## Matter II

Respondent conducted a real estate closing in which his client was purchasing property from a state agency. Respondent issued the purchase money check from his real estate trust account to the state agency on July 13, 2011, even though he had not received the funds to cover the check from his client. Respondent asked the state agency to hold the check until the deed was received and recorded. On July 28, 2011, respondent informed the state agency it could negotiate the check. The check was returned for insufficient funds because the client's funds were not credited to the trust account until July 29, 2011.

## Matter III

From 2007 through 2011, respondent issued approximately $1,407,928.00 in checks payable to himself or to his law firm from his real estate trust account. Records produced by respondent reflect approximately $182,572.00 of the funds were earned fees. Respondent's records are not sufficient to explain the difference of approximately $1,225,356.00 in disbursements.

However, it can be determined that, sometime in 2010, respondent could not cover the disbursement in a real estate closing because the balance in his real estate trust account was insufficient. From that point forward, respondent engaged in a pattern of using funds received for one real estate closing to pay off the loan in a previous closing.

### A.

In January 2011, respondent conducted a cash closing for Client A. Client A wired $487,883.31 to respondent's real estate trust account for the purchase of the property. Respondent was supposed to use the funds to pay off the seller's

mortgage of approximately $435,132.03. After the deposit of Client A's funds, respondent paid the commissions and other closing costs, but did not have sufficient funds to pay off the loan. The balance in respondent's real estate trust account at the end of January 2011 was only $148,577.99.

In February 2011, respondent used the remaining funds from Client A to pay off the loan in a prior closing. The payoff of the loan in the prior closing left only $74.00 in the trust account. The seller's mortgage in the Client A closing remained unpaid.

In March 2011, respondent conducted a real estate closing for Client B. Respondent used the funds received for Client B's closing to issue a check for $200,000.00 as a partial payment on the seller's loan in the Client A closing.

In May 2011, respondent borrowed $225,000.00 from Mr. Doe, a client and friend. Respondent deposited that money into his trust account and used the money to pay off the loan in the Client B closing and to make monthly payments on the balance of the loan in the Client A closing.

In August 2011, respondent attempted to make arrangements to borrow another $200,000.00 from Mr. Doe. Respondent intended to deposit the proceeds of this second loan into his operating account and then transfer it to his real estate trust account to pay off the balance in the Client A closing. Before respondent received the money, he wrote a check for $200,000.00 from his operating account and deposited it into his real estate trust account. He then arranged to wire funds to pay off the balance of the loan in the Client A closing. At the time respondent wrote the operating account check and sent the wire from his real estate trust account, he knew he had not deposited funds to cover these transactions.

Ultimately, respondent did not receive a second loan from Mr. Doe. The operating account check failed to clear because respondent never deposited the funds to cover it. As a result, $200,000.00 was charged back to respondent's trust account. In the meantime, respondent's title insurance company paid the seller's loan in the Client A closing.

## B.

On July 31, 2011, Client C wired $10,600.00 to respondent's real estate trust account for the purchase of a time share from the trust of an elderly woman with Alzheimer's disease. The transaction was scheduled to close in September 2011. Respondent transferred the time share but did not pay the seller's trust.

From the date of the receipt of Client C's wire until August 31, 2011, respondent issued nine checks from his real estate trust account payable to his law firm totaling $11,280.00. Respondent's records are insufficient to determine whether or not any of these payments were legitimate, however, none of these payments were made on behalf of Client C. The balance in the real estate trust account fell below the amount of the Client C deposit eleven times in August and September 2011. Funds were not available to cover Client C's closing at the time of respondent's interim suspension in November 2011.

## C.

On August 30, 2011, respondent deposited $236,000.00 received for a refinance closing for Mr. and Mrs. Roe into his real estate trust account. The loan proceeds were supposed to be used to pay off three existing loans totaling $226,689.14 and to cover closing costs. The Roes' credit union was the lender on the new loan and the existing loans. Upon receipt of the proceeds of the Roes' new loan, respondent used part of those funds to reimburse the title insurance company for its payoff of the Client A loan. On September 9, 2011, respondent conducted the Roes' closing knowing funds received for that purpose were not in his real estate trust account. Respondent did not mail the payoffs of the Roes' existing loans to the credit union.

Between August 30, 2011, and September 26, 2011, respondent wrote twelve checks payable to his law firm totaling $12,090.00. At the end of September 2011, the balance in respondent's real estate trust account was less than $5,000.00, more than $220,000.00 short of the funds that were due in connection with the Roe closing.

For several weeks, the Roes and representatives of the credit union made repeated, unsuccessful attempts to contact respondent about the payoff of the existing loans. On October 18, 2011, respondent contacted the Roes and told them they could come to his office to pick up the payoff checks at 10:00 a.m. the next morning. For medical reasons, the Roes could not drive to Myrtle Beach, so a representative of the credit union agreed to go.

On October 19, 2011, respondent gave the credit union representative four checks, three from his real estate trust account and one from his operating account. At the time respondent disbursed the checks, there were no funds in his accounts to cover them. Respondent had received a $350,000.00 check for a closing from another client[1] and had intended to use this money to cover the checks to pay off the Roe's loans, but he had not yet deposited that check.

Upon receipt of the Roes' payoff checks, the credit union representative went to the Myrtle Beach branch of the Conway National Bank which was two blocks away from respondent's office. The representative inquired if there were sufficient funds in the accounts to cover the checks and was informed there were not sufficient funds.

The credit union representative returned to respondent's office. Respondent informed the representative that he had not yet made the deposit to cover the checks, but intended to do so later in the day. Respondent then agreed to make the deposit and meet the representative at noon. Respondent then drove to the Conway branch of the bank, miles from his office, rather than make the deposit at the branch nearby. Respondent deposited the other client's closing check into his trust account then returned to his office in Myrtle Beach and showed the credit union representative the deposit slip as evidence that the Roes' payoff checks were covered. The credit union representative then deposited the checks into the credit union account.

The three Roe payoff checks written on the real estate trust account were returned due to insufficient funds as the bank had placed a hold on the $350,000.00 check. Ultimately, the

---

1. Respondent does not recall the name of this client and he is unable to produce any documentation related to this closing.

bank determined that the check was fraudulent. At the time the bank returned the Roe payoff checks to the credit union, there was only $10.25 in respondent's real estate trust account. Forty-six dollars and sixty-five cents ($46.65) remained in respondent's other trust account.

## Matter IV

After paying the mortgage in the Client A closing, the title insurance company terminated respondent as an approved closing attorney. Respondent manufactured a closing protection letter for the Roe closing by using a closing protection letter from an unrelated file and cutting and pasting the Roes' closing information onto it; respondent submitted the letter to the Roes' lender. The closing was not approved by the title insurance company and the closing protection letter was not valid. As a result, when respondent failed to pay off the Roes' existing loans, there was no title insurance to cover the loss. Consequently, the Roes were obligated to make monthly payments on both the new mortgage and existing loans.

The Roes made monthly payments on all of the loans until the matter was sorted out. The matter was resolved when the credit union agreed not to collect on the new loan and to restore the Roes to the position they were in prior to the refinance. The credit union filed a claim with its insurance carrier for the loss of the new loan proceeds. The Lawyers' Fund paid the Roes $4,231.45 as reimbursement for the extra loan payments they made to the credit union.

## Matter V

Respondent had represented Mr. Doe and his company in a number of matters for several years. *See* Matter III(A). On May 30, 2011, in an attempt to cover for the funds in the Client B closing, respondent borrowed $225,000.00 from Mr. Doe. At the time of the loan, respondent was representing Mr. Doe's company in a real estate transaction. Respondent signed a promissory note stating that he would repay the full amount plus 10% interest on June 30, 2011. When respondent was unable to repay the loan as agreed, he promised Mr. Doe he would file a mortgage to secure the loan.

Respondent failed to comply with the Rules of Professional Conduct when he entered into this business transaction with

his client, Mr. Doe. First, the terms of the loan were not fair and reasonable to Mr. Doe as respondent knew the only source for repayment would be funds received on behalf of a client for a real estate closing. Respondent knew he would not obtain funds from a legitimate source to pay off the loan to Mr. Doe within thirty days. Second, respondent failed to advise Mr. Doe, in writing or otherwise, of the desirability of seeking the advice of independent legal counsel regarding the loan. Finally, respondent failed to disclose the conflict of interest or obtain Mr. Doe's informed, written consent, as required by the Rules of Professional Conduct.

Respondent failed to repay the loan as agreed. Respondent did not record a mortgage to secure the loan. In December 2011, Mr. Doe filed a civil action in an attempt to recover the funds. In April 2012, Mr. Doe obtained a default judgment against respondent in the amount of $247,320.14. The judgment has not been paid.

## *Matter VI*

In June 2011, Client D retained respondent to probate an estate. Client D paid respondent $1,500.00 for attorney's fees and $452.84 due to the Probate Court. Upon respondent's interim suspension in November 2011, Client D learned the funds had not been paid to the Probate Court. Client D was informed by the attorney appointed to protect respondent's clients' interests that her funds were not on deposit in respondent's trust account.

Client D had to hire another attorney to assist her with the estate. Client D paid the funds to the Probate Court. She received $1,952.84 from the Lawyers' Fund as reimbursement of the attorney's fees and other funds paid to respondent.

## *Law*

Respondent admits that by his conduct he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.3 (lawyer shall act with reasonable diligence and promptness in representing client); Rule 1.7(a)(2) (lawyer shall not represent client if there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal

interest of the lawyer); Rule 1.8(a) (lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless: a) the transaction and terms on which lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client; b) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and c) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction); Rule 1.15(a) (lawyer shall hold property of clients or third persons separate from lawyer's own property and shall retain complete records of funds for six years after termination of representation); Rule 1.15(d) (lawyer shall promptly deliver to client or third person any funds or other property that the client or third person is entitled to receive); Rule 1.15(f) (lawyer shall not disburse funds from trust account unless funds to be disbursed have been deposited and collected); Rule 1.15(g) (lawyer shall not use any entrusted property to obtain credit or other personal benefit for lawyer or any person other than the legal or beneficial owner of the property); Rule 4.1 (in the course of representing a client, lawyer shall not knowingly make false statement of material fact or law to a third person); Rule 8.4(b) (it is professional misconduct for lawyer to commit criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects); and Rule 8.4(d) (it is professional misconduct for lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation). In addition, respondent admits he has violated the provisions of Rule 417, SCACR.

Respondent also admits he has violated the following Rules for Lawyer Disciplinary Enforcement, Rule 413, SCACR: Rule 7(a)(1) (it shall be ground for discipline for lawyer to violate Rules of Professional Conduct); Rule 7(a)(5) (it shall be ground for discipline for lawyer to engage in conduct tending to pollute the administration of justice or to bring the courts or the legal profession into disrepute or conduct demonstrat-

ing an unfitness to practice law); Rule 7(a)(6) (it shall be ground for discipline for lawyer to violate the oath of office taken to practice law in this state); and Rule 7(a)(7) (it shall be ground for discipline for lawyer to willfully violate valid court order issued by a court of this state).

### Conclusion

We accept the Agreement for Discipline by Consent and disbar respondent from the practice of law in this state, not retroactive to the date of his interim suspension. Within thirty (30) days of the date of this opinion respondent shall pay the costs incurred by ODC and the Commission for the investigation and prosecution of this matter. Within sixty (60) days of the date of this opinion respondent shall enter into a payment plan with the Commission to pay the following restitution: 1) $247,320.14, plus post-judgment interest, to Mr. Doe; 2) $10,600.00 to the seller-trust for the Client C closing; 3) and repayment of all funds paid on respondent's behalf by the Lawyers' Fund, including but not limited to, payments to Client D and Mr. and Mrs. Roe. Within fifteen (15) days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30 of Rule 413, SCACR, and shall also surrender his Certificate of Admission to the Practice of Law to the Clerk of Court.

**DISBARRED.**

TOAL, C.J., PLEICONES, BEATTY, KITTREDGE and HEARN, JJ., concur.